290 P.3d 493

Alden James ARQUETTE, Petitioner/Plaintiff–Appellant/Cross–Appellee,

v.

STATE of Hawai'i, Stephen H. Levins, and Michael J.S. Moriyama, Respondents/Defendants–Appellees/Cross–Appellants.

No. SCWC–11–0000416.

Supreme Court of Hawai'i.

Dec. 14, 2012.

Eric A. Seitz, Della Au Bellati, Ronald N.W. Kim, for petitioner.

Dennis K. Ferm, Caron M. Inagaki, for respondents.

NAKAYAMA, Acting C.J, ACOBA, McKENNA, and POLLACK, JJ., and Circuit Judge CRANDALL, in Place of RECKTENWALD, C.J., Recused.

Opinion of the Court by ACOBA, J.

We hold, first, that a plaintiff may bring an action in tort for the maintenance of a malicious prosecution as well as for the initiation of a malicious prosecution. Second, we hold that the Circuit Court of the First Circuit (the court)[1] properly granted the December 24, 2009 motion for summary judgment filed by Respondents/Defendants–Appellees/Cross–Appellants State of Hawai'i (the State), Stephen H. Levins (Levins), and Michael J.S. Moriyama (Moriyama) (collectively, Respondents) with respect to the claim of Petitioner/Plaintiff–Appellant/Cross–Appellee Alden James Arquette (Petitioner) for initiation of a malicious prosecution, because there was no genuine issue of material fact that Moriyama had probable cause to file a complaint against Petitioner and that Moriyama did not act with malice. Third, we conclude that although the court did not recognize a cause of action for maintenance of a malicious prosecution, the court properly granted Respondents' April 12, 2010 motion

---

1. The Honorable Karl K. Sakamoto presided.

for summary judgment, because there was no genuine issue of material fact that Moriyama maintained the prosecution with probable cause and without malice. Fourth, Hawai'i Revised Statutes (HRS) § 487–1 (2008)[2] does not set forth a standard of care in a claim for negligence. Fifth, we reaffirm that when denying costs to the prevailing party, the court must state its reasons for doing so on the record, and therefore the court erred in failing to state its rationale for granting in part Petitioner's July 28, 2010 Motion for Review and/or to Set Aside Taxation of Costs (Motion for Review of Costs). Finally, we conclude that the Intermediate Court of Appeals (ICA) did not abuse its discretion in denying Petitioner's November 29, 2011 Motion for Recusal of Substitute Judge, the Honorable Associate Judge Katherine G. Leonard (Motion for Recusal), because the facts as alleged were insufficient to warrant her recusal.

For the reasons stated herein, we affirm in part and vacate in part the court's April 19, 2011 Amended Final Judgment. We affirm the Amended Final Judgment with respect to the court's March 29, 2010 and June 30, 2010 orders granting summary judgment, but for the reasons stated herein, and we vacate the court's Amended Final Judgment with respect to its August 23, 2010 Order Granting Plaintiff's Motion for Review of Costs (Order Granting Costs) and remand for review of Respondents' taxation of costs. Therefore, we affirm the August 10, 2012 judgment of the ICA filed pursuant to its July 12, 2012 Summary Disposition Order, but based on the reasons stated herein.[3] Additionally, we affirm the ICA's December 6, 2011 order denying Petitioner's Motion for Recusal.

I.

A.

Respondents initiated an action on July 19, 2004 (2004 action), against Petitioner and others, based on an investigation conducted by the Office of Consumer Protection (OCP). The complaint alleged, *inter alia,* that Petitioner had participated in a scheme to sell long term deferred annuities to elderly consumers through unfair or deceptive acts or practices in violation of HRS §§ 480–2 (1993 & Supp.2002)[4], 481A–3 (1993)[5], and other

---

2. HRS § 487–1 states:

**Legislative Intent.** The public health, welfare and interest require a strong and effective consumer protection program to protect the interests of both the consumer public and the legitimate business person. Toward this end, a permanent office of consumer protection is created to coordinate the services offered to the consumer by various state and county agencies, together with private organizations, and to aid in the development of preventive and remedial programs affecting the interest of the consumer public.

3. The SDO was filed by Presiding Judge Daniel R. Foley and Associate Judges Alexa D.M. Fujise and Katherine G. Leonard.

4. HRS § 480–2 provides:

**Unfair competition, practices, declared unlawful.**

(a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

(b) In construing this section, the courts and the office of consumer protection shall give due consideration to the rules, regulations, and decisions of the Federal Trade Commission and the federal courts interpreting section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended.

(c) No showing that the proceeding or suit would be in the public interest (as these terms are interpreted under section 5(b) of the Federal Trade Commission Act) is necessary in any action brought under this section.

(d) No person other than a consumer, the attorney general or the director of the office of consumer protection may bring an action based upon unfair or deceptive acts or practices declared unlawful by this section.

(e) Any person may bring an action based on unfair methods of competition declared unlawful by this section.

5. HRS § 481A–3 provides, in pertinent part:

**Deceptive trade practices.**

(a) A person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person:
. . .
(2) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3) Causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another;
. . . .
(5) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship,

statutory provisions. Respondents identified several individuals, including Limuel and Hazel Cherry (the Cherrys) and other consumers as the target of Petitioner's alleged scheme. As alleged by Respondents in the complaint, the scheme involved Petitioner, insurance agent Dan Fox, attorney Rodwin Wong and others using Rodwin Wong's name and law practice on mailings offering information about elder law to solicit consumers. Individuals who responded to the mailings were then contacted at their homes where Petitioner and others falsely identified themselves as "paralegals" working for Rodwin Wong in order to obtain personal and confidential financial information from them. Based on this information, Petitioner and others allegedly sold or attempted to sell long term annuities to these consumers while failing to provide them with information necessary to make decisions in their best interest and "engag[ing] in conduct which created a likelihood of confusion or of misunderstanding."

On December 21, 2005, the court[6] filed an order granting Petitioner's motion for partial summary judgment on the claims pertaining to the Cherrys.[7] On December 22, 2005, the court granted in part and denied in part, Petitioner's motion for summary judgment on the claims pertaining to the other consumers. On May 16, 2006, the court denied Moriyama's motion to continue trial, and ordered a severance of the trial as to Petition-

er. Petitioner and Respondents stipulated to dismiss the remaining claims against Petitioner pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 41(a)(1)(B)[8] and the court filed a Stipulation for Dismissal Without Prejudice on June 26, 2006.

### B.

Petitioner then filed the present action against Respondents on January 17, 2008. His allegations were based on the facts as recited above, and in his complaint, he alleged that Respondents were liable for malicious prosecution, negligent investigation, negligent failure to train and/or supervise, and punitive damages arising from the initiation and maintenance of the 2004 action. Petitioner sued Moriyama in his individual and official capacities for negligent investigation and malicious prosecution. In addition, Petitioner sued Levins in his individual and official capacities, as well as the State, for negligent failure to train and/or supervise Moriyama. Respondents answered the complaint on May 29, 2008, and discovery commenced in the case, including requests for production of documents, interrogatories, and depositions.

On December 24, 2009, Respondents filed their first motion for summary judgment on Petitioner's claims pertaining to the *initiation* of the prosecution in the 2004 action, and on February 22, 2010, Petitioner filed a memorandum in opposition. The court is-

---

approval, status, affiliation, or connection that the person does not have;

. . . .

(11) Makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions; or

(12) Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

(b) In order to prevail in an action under this chapter, a complainant need not prove competition between the parties or actual confusion or misunderstanding.

(c) This section does not affect unfair trade practices otherwise actionable at common law or under other statutes of this State.

**6.** The Honorable Victoria S. Marks presided over the 2004 action underlying Petitioner's claim.

**7.** This order was granted on the basis of res judicata.

**8.** Rule 41 provides, in relevant part:

(a) **Voluntary dismissal: Effect thereof.**

(1) By plaintiff; by stipulation. An action may be dismissed by the plaintiff without order of court (A) by filing a notice of dismissal at any time before the return date as provided in Rule 12(a) or service by the adverse party of an answer or of a motion for summary judgment, or (B) *by filing a stipulation of dismissal signed by all parties* who have appeared in the action, in the manner and form prescribed by Rule 41.1 of these rules. Unless otherwise stated in the notice of dismissal or stipulation, the dismissal is without prejudice, except that a notice of dismissal operates as an adjudication upon the merits when filed by a plaintiff who has once dismissed in any court of the United States, or of any state, territory or insular possession of the United States an action based on or including the same claim.
(Emphasis added.)

sued an order granting in part Respondents' first motion for summary judgment with respect to the negligent supervision and training claims against the State and Levins,[9] as to the negligent investigation claim against Moriyama, and as to the initiation of a malicious prosecution claim against Moriyama. The court denied in part Respondents' first motion for summary judgment.[10] The court noted that it had not ruled on Petitioner's claim that Moriyama was liable for maintaining a malicious prosecution.

On April 12, 2010, Respondents filed a second motion for summary judgment on Petitioner's claims pertaining to the *maintenance* of the prosecution in the underlying action. Petitioner filed his opposition to the motion on June 4, 2010, and Respondents filed a reply on June 10, 2010. On July 30, 2010, the court issued an order granting Respondents' second motion for summary judgment as to Petitioner's claims pertaining to the maintenance of the prosecution in the 2004 action.

On July 2, 2010, Respondents filed a Notice of Taxation of Costs pursuant to HRCP Rule 54(d) and HRS § 607-9 (1993). Respondents asked the court to require Petitioner to pay for the costs of mediation, of depositions of certain persons, and of the transcript of the first motion for summary judgment hearing. On July 13, 2010, Petitioner filed his Motion for Review of Costs. Respondents filed a Memorandum in Opposition to Petitioner's Motion for Review of Costs. On August 23, 2010, the court granted in part and denied in part Petitioner's Motion. The court entered final judgment in favor of Respondents on September 2, 2010 as to Moriyama in his official and individual capacities, Levins in his official and individual capacities, and the State.

### C.

Petitioner filed a Notice of Appeal to the ICA on May 18, 2011. On November 29, 2011, Petitioner filed his Motion for Recusal, requesting that Judge Leonard be recused from the ICA panel. The ICA entered an order denying Petitioner's Motion for Recusal on December 6, 2011.

### II.

On appeal to the ICA, Petitioner argued that the court erred (1) in concluding that Respondents established probable cause to initiate the 2004 prosecution of Petitioner, (2) in deciding that HRS § 487-1 does not create an actionable duty of care to support a claim for negligence, and (3) in holding that Hawai'i does not recognize a tort action for maintaining a prosecution when probable cause to continue no longer exists. Respondents filed a Cross-Appeal to the ICA (Cross-Appeal), seeking a reversal of the court's Order Granting Costs in part.

With respect to Petitioner's first argument, the ICA upheld the court's grant of summary judgment, concluding that Respondents had probable cause to initiate a prosecution. *Arquette v. State,* No. CAAP-11-0000416, 128 Hawai'i 129, 2012 WL 2864352, at *1 (App. July 12, 2012) (SDO). According to the ICA, Respondents presented sufficient evidence to indicate they had an honest and reasonable belief that there was probable cause to initiate the 2004 action, based on a declaration by Moriyama and evidence that Petitioner's business cards and letterhead identified Petitioner as a paralegal for attorney Rodwin Wong, but listed the address and phone number of Dan Fox's insurance sales company which was, at the time, under investigation by the OCP. *Id.* at *2.

In addressing Petitioner's second argument, the ICA affirmed the court's determination that HRS § 487-1 did not create a private right of action. *Id.* at *3. The determinative factor, the ICA noted, was that there was no legislative history establishing a private right of action in HRS § 487-1. *Id.*

The ICA also rejected Petitioner's third argument, holding that Hawai'i does not rec-

---

9. Petitioner did not appeal the court's ruling as to the negligent supervision claims against Levins and the State.

10. The court denied Respondents' first motion for summary judgment as to "Doe defendants" who were not identified at the time the complaint was filed. The "Doe defendants" are not at issue in this case.

ognize the tort of maintaining a malicious prosecution. *Id.* The ICA explained that *Young v. Allstate Ins. Co.,* 119 Hawai'i 403, 198 P.3d 666 (2008), "clearly indicates that malicious prosecution is limited to the initiation of an action against a defendant." *Id.*

Lastly, the ICA noted that although " '[t]he award of taxable cost is within the discretion of the circuit court and will not be disturbed absent a clear abuse of discretion[,]' " *id.* at *4 (quoting *Pulawa v. GTE Hawaiian Tel,* 112 Hawai'i 3, 10–11, 143 P.3d 1205, 1212–13 (2006)), the court "abused its discretion when it reduced the amount of taxable costs without adequate explanation or a readily discernable rationale in the record." *Id.* (citing *Wong v. Takeuchi,* 88 Hawai'i 46, 52, 961 P.2d 611, 617 (1998)).

## III.

Petitioner presents the following questions in his Application, "[1][d]id the ICA gravely err in holding that a prosecution continued without probable cause would not support a cause of action for malicious prosecution? [;][2][d]id the ICA gravely err in finding that, taking all the facts and reasonable inferences in the light most favorable to [Petitioner], there was probable cause to initiate the prosecutions? [;][3][d]id the ICA gravely err in misconstruing [Petitioner's] argument that HRS § 487–1 stated a standard of care? [;][4][d]id the ICA gravely err in overturning the [court's] discretionary decision to deny [Respondent's] costs that were not statutorily authorized or reasonably necessary?[; and] [5][d]id the ICA gravely err in denying [Petitioner's] Motion For Recusal of Substitute Judge?"

On October 22, 2012, Respondents filed a Response to Petitioner's Application (Response).

## IV.

### A.

■ We hold that continuing to prosecute an action without probable cause is included in the tort of malicious prosecution. The ICA held that *Young* "clearly indicates that [the tort of] malicious prosecution is limited

to the initiation of an action against a defendant." *Arquette,* 2012 WL 2864352, at *3. However, in *Young,* this court addressed the tort of malicious defense, not malicious prosecution. Although some dicta in the case may suggest that the tort of malicious prosecution is limited, *Young* does not decide the issue raised in the instant case. Instead, whether the tort of malicious prosecution includes *maintaining* a prosecution in the absence of probable cause is a matter of first impression.

In *Young, inter alia,* this court declined to recognize the tort of malicious defense. 119 Hawai'i at 416, 198 P.3d at 679. The *Young* court analogized the malicious defense tort to the tort of malicious prosecution, stating that "it is not appropriate to derive the tort of malicious defense from the tort of malicious prosecution where the tort of malicious prosecution remedies harms resulting from the *initiation* of a lawsuit." *Id.* (emphasis in original). Although this language appears to suggest that malicious prosecution is restricted to actions stemming from the *initiation* of the lawsuit, that interpretation is inapposite given the context of the case.

When *Young* emphasizes the importance of initiating a lawsuit for purposes of the malicious prosecution tort, this court is emphasizing the difference between a situation in which the defendant has *wrongfully initiated* a lawsuit and a situation where the defendant has *wrongfully defended* him or herself in an existing lawsuit. *See id.* at 418, 198 P.3d at 681 ("The tort of malicious prosecution acknowledges the special, particular harms that a defendant suffers when a lawsuit is maliciously initiated against it."). Thus, the focus of this court was on the status of the parties, and it was simply contrasting the plaintiff, who initiates a suit, with the defendant, who responds to a suit.

The decision further states that "[b]ecause a malicious prosecution claim is triggered when the unsuccessful party initiated the lawsuit, 'the defendant is not liable for proceedings unless he has initiated them.' " *Id.* at 417, 198 P.3d at 680 (quoting Prosser and Keeton on Torts § 120, at 893 (5th ed., W. Page Keeton, et al. eds., 1984)) (brackets omitted). Here, again, this court was distin-

guishing between the two parties and not explicitly limiting the "trigger[ing]" of a malicious prosecution to when a lawsuit is initiated. *Id.* The question of when a defendant may bring a claim for malicious prosecution was not at issue in *Young.* Thus, the cases cited in *Young* setting forth the elements of a malicious prosecution, including that a plaintiff must show that the prior proceedings were *"initiated* by the defendant without probable cause, and [ ] *initiated* by the defendant with malice[,]" *id.* at 430, 198 P.3d at 693 (citing *Wong v. Cayetano,* 111 Hawai'i 462, 478, 143 P.3d 1, 17 (2006)) (emphasis added), are not controlling as to whether this court may consider a continuation of the tort beyond initiation of a prosecution. In sum, *Young* has no preclusive effect on whether this court should now recognize a tort for maintaining a malicious prosecution.

### B.

■ It is well-established that this court may recognize a new cause of action in tort. *Fergerstrom v. Hawaiian Ocean View Estates,* 50 Haw. 374, 375, 441 P.2d 141, 142 (1968) (holding that this court could adopt a cause of action for invasion of privacy, despite the fact that neither the ancient common law nor prior Hawai'i case law recognized the right). The purpose underlying the tort of malicious prosecution is to protect "the interest in freedom from unjustifiable litigation." *Young,* 119 Hawai'i at 418, 198 P.3d at 681 (quoting Prosser and Keeton on Torts § 119, at 870) (brackets omitted). Although litigation may be warranted in the eyes of the plaintiff at its commencement, if that plaintiff becomes aware that the litiga-

tion is no longer justified, then the plaintiff should terminate the litigation. Indeed, "litigation 'has a profound effect upon the quality of one's life that goes beyond the mere entitlement to counsel fees.' " *Id.* at 421, 198 P.3d at 684 (quoting *Aranson v. Schroeder,* 140 N.H. 359, 671 A.2d 1023, 1028 (1995)).

If a plaintiff fails to terminate litigation when he or she knows it would be appropriate to do so, then the same harms are inflicted on the defendant's quality of life that would have been inflicted if the plaintiff knew that the litigation was unjustified in the first instance. In order to properly guard against the harms associated with protracted litigation, the tort of maintaining malicious prosecution should be recognized.

Moreover, many of the reasons that this court enumerated in *Young* for rejecting the tort of malicious defense are inapplicable to the tort of maintaining a malicious prosecution. In *Young,* the court noted that "the malicious defense tort is 'unfamiliar, if known at all[,]' " *id.* at 417, 198 P.3d at 680 (quoting Jonathan K. Van Patten & Robert E. Willard, *The Limits of Advocacy: A Proposal for the Tort of Malicious Defense in Civil Litigation,* 35 Hastings L.J. 891, 893 (1984)), and that only one jurisdiction, New Hampshire, had recognized it. *Id.* at 418, 198 P.3d at 682. While not dispositive, this factor was relevant in this court's decision not to extend Hawai'i tort law. Unlike the malicious defense tort that has limited acceptance, a cause of action for continuing a malicious prosecution has been recognized in the Restatement (Second) of Torts,[11] and by a substantial number of states.[12] Although not

---

11. Section 674 of the Restatement provides:

> One who takes an active part in the initiation, *continuation* or procurement of civil pro against another is subject to liability for wrongful civil proceedings if
> (a) he acts without probable cause primarily for a purpose other than that securing the proper adjudication of the in which the proceedings are based, and
> (b) except when they are ex parte, the proceedings have terminated in favor of the person against whom they are brought.

Restatement (Second) of Torts § 674 (emphasis added).

12. As the California Supreme Court noted in *Zamos v. Stroud,* 32 Cal.4th 958, 12 Cal.Rptr.3d 54, 87 P.3d 802, 808 (2004):

> The Restatement's position on this question has been adopted or was anticipated by the courts of a substantial number of states: Alabama (*Laney v. Glidden Co., Inc.*[,] 239 Ala. 396, 194 So. 849, 851–852 [ (Ala.1940) ] ); Arizona (*Smith v. Lucia*[,] 173 Ariz. 290, 842 P.2d 1303, 1308 [ (Ariz.Ct.App.1992) ] ); Arkansas (*McLaughlin v. Cox*[,] 324 Ark. 361, 922 S.W.2d 327, 331–332 [ (Ark.1996) ] ); Colorado (*Slee v. Simpson*[,] 91 Colo. 461, 15 P.2d 1084, 1085 [ (Colo.1932) ] ); Idaho (*Badell v. Beeks*[,] 115 Idaho 101, 765 P.2d 126, 128 [ (Idaho 1988) ] ); Iowa (*Wilson v. Hayes*[,] 464 N.W.2d 250, 264 [ (Iowa 1990) ] ); Kansas

controlling, the recognition in other jurisdictions is instructive as to whether a new cause of action should be adopted in Hawai'i. As this court stated in *Fergerstrom*, "[w]e are disinclined to decide an important issue merely on the basis of the number of states adopting a given approach. But some weight must be accorded to the overwhelming recognition of a common law right of privacy by all but a few states." 50 Haw. at 375, 441 P.2d at 143.

Respondents counter that allowing a cause of action for continuing a malicious prosecution would promote lawsuits *ad infinitum*. (Citing *Brodie v. Hawai'i Auto. Retail Gasoline Dealers Ass'n*, 2 Haw.App. 316, 321, 631 P.2d 600, 604 (1981), *rev'd on other grounds*, 65 Haw. 598, 655 P.2d 863 (1982).) However, it would no more promote lawsuits than this court's current conception of the tort of malicious prosecution. In its reasoning for rejecting the tort of malicious defense, *Young* states that "[p]ermitting a plaintiff to bring a second lawsuit against the same party as the underlying case where other workable remedies exist may allow such plaintiff to recover twice against the defendant and needlessly burden the already overworked judicial system." *Young*, 119 Hawai'i at 424, 198 P.3d at 687.

In contrast, recognizing the tort of maintaining a malicious prosecution would not allow any additional recovery, but would provide a remedy to those litigants who may have been brought into court on the basis of good faith, but who were maliciously kept there. Further, as in bringing a claim for initiating malicious prosecution, a complainant would have to premise his or her claim for maintaining a malicious prosecution on narrowly construed elements. As with the tort of initiating malicious prosecution, the tort of maintaining malicious prosecution would not chill zealous advocacy, because liability would only attach when the plaintiff maliciously maintains an unreasonable claim. *See id.* at 431, 198 P.3d at 694 (Levinson, J., dissenting) (citing *Cayetano*, 111 Hawai'i at 483, 143 P.3d at 22 (reiterating that malice is an essential element that the complainant must demonstrate in order to maintain an action for malicious prosecution)).

Additionally, the existing rules and statutes do not fully remedy the harms inflicted by protracted litigation. As the Court of Appeal in California pointed out when addressing this issue, " '[h]olding attorneys liable for the damages a party incurs as a result of the attorneys prosecuting civil claims after they learn the claims have no merit will [ ] encourage voluntary dismissals of meritless claims at the earliest stage possible[,] ... [and] the attorney will serve the client's best interests in that the client will avoid the cost of fruitless litigation[.]' " *Zamos*, 12 Cal. Rptr.3d 54, 87 P.3d at 809–10 (quoting *Zamos v. Stroud*, 1 Cal.Rptr.3d 484, 494 (Cal. Ct.App.2003)). Although the conduct associated with continuing a malicious prosecution is subject to sanctions under HRCP Rule 11 (permitting recovery of attorneys fees),[13] at-

(*Nelson v. Miller*[,] 227 Kan. 271, 607 P.2d 438, 447–448 [(Kan.1980)]); Mississippi (*Benjamin v. Hooper Electronic Supply Co., Inc.*[,] 568 So.2d 1182, 1189, fn. 6 [(Miss. 1990)]); New York (*Broughton v. State of New York*[,] 37 N.Y.2d 451, 373 N.Y.S.2d 87, 335 N.E.2d 310 [(N.Y.1975)]); Ohio (*Siegel v. O.M. Scott & Sons* Co.[,] 73 Ohio App. 347, 56 N.E.2d 345, 347 [(Ohio Ct.App.1943)]); Oregon (*Wroten v. Lenske*[,] 114 Or.App. 305, 835 P.2d 931, 933–934 [(Or.1992)]); Pennsylvania (*Wenger v. Philips*[,] 195 Pa. 214, 45 A. 927 [(Pa.1900)]); and Washington (*Banks v. Nordstrom, Inc.*[,] 57 Wash.App. 251, 787 P.2d 953, 956–957 [(Wash.1990)]).

13. *See, e.g.*, HRCP Rule 11 which states, in pertinent part:

(b) **Representations to court.** By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so

torneys fees may not always provide a complete remedy to a litigant whose reputation may have been damaged. *See Young,* 119 Hawai'i at 418, 198 P.3d at 681 (citing *Stanley v. Superior Court,* 130 Cal.App.3d 460, 181 Cal.Rptr. 878, 882 (1982)). Furthermore, "[s]omewhere along the line, the rights of the defendant to be free from costly and harassing litigation must be considered. So too must the time and energies of our courts and the rights of would be litigants awaiting their turns to have other matters resolved." *Ellis v. Harland Bartholomew & Assocs.,* 1 Haw. App. 420, 428, 620 P.2d 744, 750 (1980) (citation omitted).

do so, and that the attorney is motivated by malice.

■ Although the tort of malicious prosecution is " 'not generally favored in our legal system, and thus its requirements are construed strictly against the party bringing the action,' " *Young,* 119 Hawai'i at 419, 198 P.3d at 682 (quoting *Wong v. Tabor,* 422 N.E.2d 1279, 1283 (Ind.Ct.App.1981)), the tort of the continuation of a malicious prosecution is not an unwarranted enlargement of the current doctrine but, rather, logically stems from the policies underlying the tort.

## C.

■ A workable standard for continuation of malicious prosecution is easily garnered from the elements that must be shown to prove the initiation of a malicious prosecution. Thus, the standard for continuing a malicious prosecution would be (1) that the prior proceedings were terminated in the plaintiff's favor, (2) that the prior proceedings were *maintained* without probable cause, and (3) that the prior proceedings were *maintained* with malice. *See Zamos,* 12 Cal.Rptr.3d 54, 87 P.3d at 810 (with a similar test for initiating malicious prosecution as Hawai'i, applying the same standard to the continuation as to the initiation of a suit). Hence, a claim for continuation of malicious prosecution could be brought under circumstances in which an attorney has taken affirmative action toward continuance of a prosecution, despite the fact that the attorney knows he or she lacks probable cause to

## V.

■ With respect to Petitioner's second question, " '[t]here are three essential elements in a claim for [initiating] malicious prosecution: (1) that the prior proceedings were terminated in the plaintiff's favor, (2) that the prior proceedings were initiated without probable cause, *and* (3) that the prior proceedings were initiated with malice.' " *Myers v. Cohen,* 67 Haw. 389, 391, 688 P.2d 1145, 1148 (1984) (quoting *Brodie,* 2 Haw. App. at 318, 631 P.2d at 602)(other citation omitted)(emphasis added). Accordingly, in a valid claim for initiating a malicious prosecution, all three elements must be satisfied. In his Application to this court, Petitioner challenged the ICA's holding that the court properly granted Respondents' motion for summary judgment on the issue of whether there was probable cause to initiate the prosecution.[14]

identified, are reasonably based on a lack of information or belief.
(c)**Sanctions.** If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.
14. " 'Unlike other appellate matters, in reviewing summary judgment decisions an appellate court steps into the shoes of the trial court and applies the same legal standard as the trial court applies.' " *Blaisdell v. Dep't of Pub. Safety,* 119 Hawai'i 275, 284, 196 P.3d 277, 282 (2008) (quoting *Beamer v. Nishiki,* 66 Haw. 572, 577,

670 P.2d 1264, 1270 (1983)). "This court reviews a circuit court's grant or denial of summary judgment de novo." *Id.* (citations omitted).

[S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that *there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.* A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.
*Id.* (emphasis in original) (quoting *Omerod v. Heirs of Kaheananui,* 116 Hawai'i 239, 254–55, 172 P.3d 983, 998–99 (2007)) (citations omitted).

## A.

■ The issue of probable cause for initiation of the prosecution was addressed most extensively in the proceedings and is considered first. Probable cause in a malicious prosecution action depends "not on the actual state of the facts but upon the honest and reasonable belief of the party commencing the action." *Brodie*, 2 Haw.App. at 318, 631 P.2d at 602 (citations omitted).

■ [P]robable cause for the filing of a lawsuit exists where a person:

> reasonably believes in the existence of the facts upon which the claim is based, and either
>
>> (a) correctly or reasonably believes that under those facts the claim may be valid under the applicable law, or
>>
>> (b) believes to this effect in reliance upon the advice of counsel, sought in good faith and given after full disclosure of all relevant facts within his knowledge or information.

*Id.* at 319, 631 P.2d at 602 (quoting Restatement (Second) of Torts § 675 (1977)). The determination as to whether a particular party had probable cause is both a subjective and objective question. *See, e.g., Bertero v. Nat'l Gen. Corp.*, 13 Cal.3d 43, 118 Cal.Rptr. 184, 193, 529 P.2d 608 (1974); *Williams v. City of New York*, 508 F.2d 356, 359 (1974). The first question is whether the party had the subjective belief that he or she possessed probable cause in the underlying action. The second question is whether that belief was reasonable.

## B.

■ Respondents argued in their Memorandum in Support of their first motion for summary judgment that "[a]ll the evidence[ ] . . . establishes that, based on the information known to Moriyama at the time he filed suit in July 2004, he had a reasonable basis for initiating [the 2004 action] against [Petitioner]." [15] In support of this allegation, Respondents attached Moriyama's declaration stating that at the time the action was filed, Petitioner and other defendants had been the subject of an ongoing investigation for several years, and which had shown Petitioner was involved with a group of insurance salespeople who referred to themselves as "paralegals."

According to Moriyama, he had information in 2004 based on interviews with consumers that these salespeople were selling deferred annuities to elderly citizens in Hawai'i, and that OCP had "initially identified thirty-three [ ] consumers who: 1) Within the previous four [ ] years at the time had purchased or signed applications to purchase annuities through Dan Fox or others working with Dan Fox, and 2) Were in their seventies [ ] or eighties [ ] at the time." Respondents provided a list of these thirty-three alleged consumers. Moriyama stated that at the time the lawsuit was filed, "OCP knew four [ ] individuals or couples who dealt with [Petitioner] and would be identified as witnesses ([the] Arrudas, James Gamache, [the] Paakaulas, and [the] Pachecos)." Moriyama further averred that after filing the lawsuit, four additional consumers who reported that they dealt with [Petitioner] either complained to OCP or were referred to OCP (James Ah Nee, the Cherrys [16], and Blanche Schwarz).

---

**15.** The complaint against Petitioner in the 2004 action alleged, *inter alia*, that he committed deceptive acts in falsely representing himself as a paralegal, operating under the guise of estate planning, failing to provide required information to consumers regarding replacement insurance or annuity contracts, misrepresenting the suitability or appropriateness of selling securities and purchasing deferred annuities, engaging in unlicensed securities transactions, acting as an unlicensed investment adviser, employing high pressure sales tactics, and targeting the elderly, in violation of HRS §§ 480–2, 481A–3, and other statutory provisions.

**16.** Petitioner included a declaration attached to his Memorandum in Opposition to Respondents' first motion for summary judgment, which relates to his alleged violation of a temporary restraining order obtained on behalf of Mrs. Cherry. Petitioner's interactions with the Cherrys were apparently the subject of actions by other state agencies. This declaration by Petitioner does not appear relevant to whether Moriyama acted with probable cause or malice.

As an example of the pattern which Petitioner and other defendants allegedly engaged in, Moriyama stated that James Gamache related that Petitioner "explained the 'system' and took the check payable to Rodwin Wong" from James Gamache. Respondents provided a copy of a receipt given to James Gamache signed by Petitioner on a line marked "Paralegal Signature" and that contained a "Law Offices of Rodwin L. Wong" letterhead, but listed the address of what was allegedly Dan Fox's insurance business at 6650 Hawaii Kai Drive, Suite 201. Respondents also included a copy of a business card given to the Pachecos that identified Petitioner as a "paralegal" but listed the office address of Dan Fox. According to Moriyama's declaration, the annuity contracts that were eventually sold to the Pachecos had thirty year deferral periods, and Mrs. Pacheco was sixty-five years old at the time she purchased the annuity. A redacted copy of the specifications of the Pacheco annuity was also provided by Respondents, which state the "Maturity Date" as September 13, 2029.

Additionally, Respondents provided the declaration of Levins, Moriyama's supervisor, stating that he discussed the facts that supported the filing of the complaint, and it was his "understanding that there was sufficient information to believe that [Petitioner], along with others, were engaging in deceptive and unfair sales practices in the marketing of high dollar amount deferred annuities to a substantial number of elderly persons in the State of Hawai'i."

In his affidavit attached to both his Memoranda in Opposition to Respondents' first and second motions for summary judgment, Petitioner alleges that "[a]ll work I performed for the Law Offices of Rodwin Wong was at the direction of and under the supervision and responsibility of [Rodwin Wong][,] [Rodwin Wong] described my job as being a paralegal[,]" "I did not sell, attempt to sell and never even discussed the sale of [insurance products or securities] with the Arrudas, [James Gamache, the Paakaulas, and the Pachecos][,]" and "I was never privy to the relationship between the Law Offices of Rodwin Wong, [Rodwin Wong], [or] [Dan Fox]."

## C.

### 1.

Under the probable cause standard, as noted before, the first question is whether Moriyama subjectively believed that he had probable cause to initiate the prosecution when he filed the 2004 complaint. This is unequivocally established through Moriyama's declaration, which states that "[t]he only reason [Petitioner] and the other defendants were named in the [2004 action] was because the facts obtained through years of investigation supported the allegations contained in the complaint that Petitioner engaged in unfair and deceptive acts."

The second question, then, is whether Moriyama's belief that he had probable cause was reasonable. Moriyama must have both reasonably "believ[ed] in the existence of facts upon which [his] claim [was] based" and "correctly or reasonably believed that under those facts the claim may [have been] valid under the applicable law." *Brodie*, 2 Haw. App. at 318, 631 P.2d at 602.

In this case, the declarations and other evidence indicate that Moriyama, as well as other investigators and attorneys at OCP, had engaged in an ongoing investigation for several years. Thus there was a reasonable basis for Moriyama to believe in the existence of facts upon which the complaint was based.

Next, Respondents brought numerous claims against Petitioner in the complaint, including, for example, that he had engaged in unfair and deceptive trade practices, in violation of HRS § 481A–3. As noted, HRS § 481A–3, the applicable law, states in part that "[a] person engages in deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person: (3)[c]auses likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another . . . . or (12)[e]ngages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." It is undisputed that the business cards and letterhead Petitioner used contained the name "Rodwin Wong," and the address and telephone num-

ber of Dan Fox's insurance company. Based on the information known to Moriyama when he filed the complaint, it was reasonable for him to believe that, under the facts, the claim against Petitioner of deceptive trade practices, *inter alia*, may have been valid under the applicable law. *See Brodie*, 2 Haw.App. at 318, 631 P.2d at 602.

### 2.

Petitioner argued, in his Memorandum in Opposition, that there was no reasonable basis for Respondents' 2004 complaint. He contends that Moriyama's declaration constitutes "inadmissible hearsay," and that, without that declaration, Respondents had not provided enough evidence to show that Moriyama had a reasonable basis for initiating the lawsuit. However, in deciding a motion for summary judgment, a court can consider, among other things, declarations provided by the parties to determine whether a genuine issue of material fact exists. *Blaisdell*, 119 Hawai'i at 284, 196 P.3d at 282. Since the reasonable belief had to exist in the mind of Moriyama, his declaration was relevant to determining whether summary judgment was appropriate on this issue.

Petitioner's additional objections fail to create an issue of material fact as to Moriyama's reasonable belief. Petitioner points to the fact that Moriyama did not identify specific consumers in the complaint. But this was not necessary to show that Moriyama had a "reasonable belief in the facts underlying the complaint." Petitioner asserted that Moriyama's motion to modify a protective order entered by the court, and subsequent motion to continue trial indicated that he did not have probable cause at the time he filed the complaint. However, Moriyama stated in his declaration that those efforts were tied to obtaining more admissible evidence against Petitioner. The mere fact that discovery was ongoing in the case does not indicate that Moriyama lacked probable cause to file the complaint in the first instance, because probable cause does not require that a plaintiff have all the facts that he or she may later obtain through discovery. Thus, Petitioner provides no evidence to support his allegation that Moriyama did not believe the facts un-

derlying the complaint, or that Moriyama's belief was unreasonable.

Consequently, Moriyama demonstrated that he subjectively believed in the facts upon which the complaint was based. Further, his belief in the existence of these facts was reasonable inasmuch as the facts were the result of a multi-year OCP investigation. Finally, for the reasons stated before, the facts reasonably supported Moriyama's belief that it was appropriate to bring a claim against Petitioner for, among other things, engaging in deceptive trade practices. In opposition to Respondents' first motion for summary judgment, Petitioner failed to provide any documentation that created a genuine issue of material fact as to whether Moriyama had probable cause to file a complaint. Therefore, the court did not err when it ruled in favor of Respondents on the issue of whether Moriyama had probable cause to bring the original complaint against Petitioner in the 2004 action.

### D.

At the hearing on Respondents' first motion for summary judgment, the court also apparently ruled that there was no issue of material fact that the prior proceedings were not initiated with malice. During the hearing, it stated, "[t]he court does not believe that there is a genuine issue of material fact as to number 2 and number 3, initiated with probable cause and *not initiated with malice*." (Emphasis added.) Petitioner had argued the element of malice in his Memorandum in Opposition to Respondents' first motion for summary judgment, and included an affidavit from Keith A. Matsuoka (Matsuoka), Petitioner's attorney in the 2004 action, as an attachment to his Memorandum in Opposition.

However, Petitioner alleged in a footnote in his brief to the ICA that "[a]s the court offered no factual basis for its determination that the underlying action was not initiated with malice, for the purposes of the instant appeal, it is presumed that its determination was based on its finding that the action was initiated with probable cause." Under Petitioner's approach, as alleged in this footnote, the court's finding of a lack of malice fol-

lowed from its finding of probable cause. *See, e.g., Gallucci v. Milavic,* 100 So.2d 375, 378 (Fla.1958) ("Although malice may be inferred from want of probable cause, the converse is not true.") Accordingly, on appeal, Petitioner did not challenge the court's conclusion on summary judgment that Petitioner did not make out the malice element as a matter of law.

█ In any event, " 'unless plaintiff can produce some affirmative evidence that malice existed,' " summary judgment in favor of Moriyama was appropriate on that issue. *Brodie,* 2 Haw.App. at 320, 631 P.2d at 603 (quoting 10 Wright & Miller, Federal Practice and Procedure § 2730 (1973)). Malice is defined as "[t]he intent, without justification or excuse, to commit a wrongful act." *Black's Law Dictionary* 1042 (9th ed.2009). Thus, "[i]n order to establish the element of malice for a malicious prosecution claim, a plaintiff must show *inter alia* that the defendant initiated the prior proceeding with 'the intent, without justification or excuse, to commit a wrongful act' and the emphasis is on the misuse of criminal or civil actions 'as a means for causing harm.' " *Isobe v. Sakatani,* 127 Hawai'i 368, 388, 279 P.3d 33, 53 (App.2012)(quoting *Young,* 119 Hawai'i at 419, 198 P.3d at 682) (brackets omitted).

█ This court has acknowledged that " 'it is true that malice is seldom the subject of a confession by the wrongdoer. It usually must be proved by inferences from other evidence.' " *Cayetano,* 111 Hawai'i at 483, 143 P.3d at 22 (quoting *Myers v. Cohen,* 67 Haw. 389, 397, 688 P.2d 1145, 1151 (1984)); *see also Brodie,* 2 Haw.App. at 322, 631 P.2d at 605 (holding that an inference of malice

may be supported by direct or circumstantial evidence). However, " '[b]are allegations or factually unsupported conclusions are insufficient to raise a genuine issue of material fact, and therefore, insufficient to reverse a grant of summary judgment.' " *Id.* (quoting *Reed v. City & County of Honolulu,* 76 Hawai'i 219, 230, 873 P.2d 98, 109 (1994)). Rather, a plaintiff must set forth some "independent evidence of conduct other than a voluntary dismissal, from which [ ] improper motive can be inferred." *Brodie,* 2 Haw.App. at 320, 631 P.2d at 603.

█ Here, Respondents had probable cause to initiate the suit. In support of their first motion for summary judgment, Respondents point to a lack of evidence provided by Petitioner to show malice on Moriyama's part, stating that, for example, "[t]he [Petitioner] does not dispute, ... that [ ] Moriyama extended professional courtesies to [Petitioner], pro se, after the OCP action was initiated." In response, Petitioner alleged that when the action was initiated, Moriyama had "absolutely no information showing that [Petitioner] was involved in or connected with any of the annuities or securities which formed the bases for any of the charges alleged against him," and thus, a jury could infer that Moriyama acted with malice. But, this allegation relates to probable cause, and as established *supra,* Petitioner failed to provide any evidence to create a factual question as to whether Moriyama acted with probable cause.

As noted, in opposition to Respondents' first summary judgment motion, Petitioner had included Matsuoka's affidavit,[17] in fur-

17. The Matsuoka affidavit further states that, among other things,

(29) [ ] Moriyama also appeared to exercise an unhealthy degree of influence and be over-involved in the investigations and proceedings conducted by other departments and agencies, including *State v. Arquette,* Civil No. 04–1–1985; *In re Hazel Cherry,* FC–G No. 04–1–0279; and *In re Hazel Cherry,* FC–AA No. 04–1–0008.

(30) Based on my interaction with these departments and agencies, I concluded that [ ] Moriyama was a major "source" of misinformation which formed the basis for their claims.

(31) [ ] Moriyama also appeared to exert an unhealthy degree of influence over the actions of the Office of the Public Guardian and Maximum Legal Service Corp., fiduciaries in various matters, which led to procedural difficulties with little beneficial effect except to block [Petitioner's] access to information necessary to defend himself.

(32) [ ] Moriyama's conduct, which I would term "unreasonable," needlessly increased the cost of litigation and ultimately required the trust estate of Hazel Cherry to indemnify [Petitioner] for more than $180,000 in fees and costs pursuant to an order entered in *In re Hazel Cherry,* TR. No. 06–1–0013.

ther support of his contention that Moriyama acted with malice. The affidavit stated, *inter alia,* that

(26) Throughout the course of proceedings, [ ] Moriyama appeared to display a very personal animus against [Petitioner].

(27) I believe this led [ ] Moriyama to disregard or knowingly fail to assess and analyze the applicable law in order to persecute [Petitioner] in violation of his legal rights.

(28) This animus presented itself in various ways, including his constant proclamations that [Petitioner]'s actions were the most egregious.

However, this affidavit does not establish "independent evidence" of malice sufficient to create a genuine issue of material fact. In *Cayetano,* the plaintiff alleged that the State of Hawai'i had maliciously prosecuted her on charges of hindering prosecution and conspiracy. 111 Hawai'i at 482, 143 P.3d at 21. There was no dispute that the underlying proceedings were terminated in the plaintiff's favor, and "neither side point[ed] to any evidence in the record as to whether the State had probable cause to charge [the plaintiff]." *Id.* Thus, this court addressed only whether the defendants' motion for summary judgment should be granted on the issue of malice. *Id.* at 482–83, 143 P.3d at 21–22. *Cayetano* held that the defendants had met their burden inasmuch as they pointed to records of cases arising from the same underlying facts, in which the circuit court had found that "there was no evidence to show that the indictment was improperly motivated." *Id.*

This court took judicial notice of that finding, and noted that, "the burden shifted to [the plaintiff] to demonstrate evidence of 'specific facts' to dispute or contradict [the d]efendants' evidence that there was no improper motive behind the prosecution." *Id.* The *Cayetano* court held that because the

plaintiff failed to adduce evidence of "specific facts" from which malice could be inferred, but instead "relied on the conclusory allegations of the complaint[,]" she failed to raise a genuine issue of material fact as to whether the prosecution was initiated with malice. *Id.* Similarly, here, Petitioner has relied primarily on conclusory allegations in contending that Moriyama acted with malice.

Paragraph 26 of Matsuoka's affidavit states that "[t]hroughout the course of proceedings, [ ] Moriyama appeared to display a very personal animus against [Petitioner]." Such a claim must be supported by "specific facts," because unsupported conclusions are insufficient to raise a genuine issue of material fact. With respect to Paragraph 26, Matsuoka provided his opinion that Moriyama "appeared to display a very personal animus" as a conclusion, without any discussion of supporting facts. For example, Matsuoka did not allege when this personal animus was displayed, under what circumstances, how the animus was relayed, or any other facts regarding *how* he knew that Moriyama had a personal animus toward Petitioner. Matsuoka's statement of opinion, at Paragraph 26, which does not include any "specific facts," therefore cannot serve as circumstantial evidence from which to infer malice. *See Cayetano,* 111 Hawai'i at 482, 143 P.3d at 21.

Matsuoka's affidavit then states at Paragraph 27 that "I believe this [animus] led [ ] Moriyama to disregard or knowingly fail to assess and analyze the applicable law in order to persecute [Petitioner] in violation of his legal rights." Paragraph 27 cannot provide a basis for a finding of malice inasmuch as it has been established that Petitioner *did* reasonably "assess and analyze the applicable law," because he had probable cause to bring a claim against Petitioner under the applicable law.[18] Further, Matsuoka's opinion again failed to allege any "specific facts"

However, these allegations set forth with regard to Moriyama's conduct in other proceedings are irrelevant inasmuch as they do not allege any specific facts upon which Matsuoka's conclusions are based.

**18.** As noted, under the standard for probable cause, one of the elements is whether the plaintiff "correctly or reasonably believes that under [the] facts, [his or her] claim may be valid under

the applicable law[.]" *Brodie,* 2 Haw.App. at 318, 631 P.2d at 602 (citation omitted). Since this element of probable cause has been established in this case, as discussed *supra,* Matsuoka's allegation at Paragraph 27 that Moriyama disregarded or knowingly failed to assess and analyze the applicable law cannot serve as a basis for an inference of malice.

that could form the basis of an inference of malice. He did not state how Moriyama failed to assess the applicable law, or refer to the law that Moriyama misapplied. Therefore, Petitioner did not raise a genuine issue of material fact that Moriyama was acting with "the intent, without justification or excuse, to commit a wrongful act," *Black's Law Dictionary* 1042, through "the misuse of a criminal or civil action 'as a means for causing harm.'" *Isobe*, 127 Hawai'i at 388, 279 P.3d at 53. In the instant case, Matsuoka's "unsupported conclusion" does not create a genuine issue of material fact. *See Cayetano*, 111 Hawai'i at 482, 143 P.3d at 21.

Paragraph 29 of Matsuoka's affidavit states that "[t]his animus presented itself in various ways, including his constant proclamations that [Petitioner]'s actions were the most egregious." This statement does not provide specific facts in support of Petitioner's allegation of malice. The word "egregious" is defined as "extremely or remarkably bad; flagrant." *Black's Law Dictionary* 593. However, Matsuoka does not refer to the circumstances under which these "proclamations" were made, including the number of times they were made, or when during the proceedings they were made, other than to say that they were made "constantly," and that Moriyama stated that Petitioner's actions "were *the most* egregious." (Emphasis added.) This indicates that Moriyama declared that the behavior of all the defendants was to some extent "egregious." That declaration, by itself, even if made "constantly," as alleged by Matsuoka, does not demonstrate an intent on Moriyama's part to "caus[e] harm" to Petitioner "without justification or excuse," *Black's Law Dictionary* 1042, through the initiation of the lawsuit. *Isobe*, 127 Hawai'i at 388, 279 P.3d at 53. Without specific facts regarding how these proclamations evinced a particular desire to "cause harm" on Moriyama's part, Paragraph 29 does not create a genuine issue of material fact with respect to the issue of malice.

Thus, no specific facts were alleged to create a genuine issue of material fact as to whether malice can be inferred from Moriyama's actions. Because Petitioner failed to demonstrate "independent evidence" of malice in this case, the court properly granted summary judgment to Respondents on this element of Petitioner's malicious prosecution claim.

### E.

Petitioner must establish all three elements of a malicious prosecution claim in order to sustain his action. *See Myers*, 67 Haw. at 391, 688 P.2d at 1148. There was no genuine issue of material fact with respect to probable cause or malice. Inasmuch as there was a reasonable basis for the OCP's complaint under the facts and no independent evidence of bias, *see Brodie*, 2 Haw.App. at 322, 631 P.2d at 605, the court correctly granted summary judgment to Respondents as to probable cause and malice, two of the three elements of a malicious prosecution suit. The third prong of the test relating to termination of the 2004 action in favor of Petitioner thus need not be reached. The court having been correct in granting summary judgment to Respondents on the initiation of the suit, the ICA's decision on this question must be affirmed.

### VI.

As set forth, *supra*, a cause of action for maintaining a malicious prosecution should be recognized. However, Petitioner in this case cannot make out a claim that Respondents maintained a malicious prosecution against him when they prosecuted the 2004 action. As noted before, the three elements in a claim for *maintaining* a malicious prosecution are: (1) that the prior proceedings were terminated in the plaintiff's favor, (2) that the prior proceedings were maintained without probable cause, and (3) that the prior proceedings were maintained with malice. *See, e.g., Zamos*, 12 Cal.Rptr.3d at 54, 87 P.3d 802.

At the time Respondents filed their first motion for summary judgment, the court held that the tort of malicious prosecution extended only to the initiation of a claim. However, with respect to Respondents' second motion for summary judgment, both parties provided arguments as to why Moriyama

did or did not maintain the prosecution with probable cause and without malice.[19]

## A.

▓ In applying the elements discussed above, Respondents had to establish that there was no genuine issue of material fact as to whether Moriyama had probable cause to maintain the prosecution after filing suit. In other words, when Moriyama filed his last motion in the case, his Motion to Continue Trial on April 11, 2006, he still had to have had probable cause for the claims against Petitioner.

In support of their second motion for summary judgment, Respondents stated that,

[T]hroughout the pendency of the OCP litigation, [ ] facts concerning who was in control of the 'paralegals' did not change. Moriyama and the OCP investigators who continued to work on [the] OCP investigation of [the] scheme only confirmed [Rodwin] Wong's pre-lawsuit admissions as to who was in control of [the] scheme during the pendency of that OCP lawsuit.

Respondents further pointed to Moriyama's declaration in which he recounted his interview with Rodwin Wong, who admitted that "paralegals" who worked for him actually operated under the direction of Dan Fox.

Petitioner contends in his Memorandum in Opposition to Respondents' second motion for summary judgment that OCP records both failed to reveal any complaints about him by some of the individual consumers Respondent identified, and confirmed that Petitioner never discussed insurance products or the sale of securities with them. Thus, Petitioner asserts, although Respondents knew in February 2002 that Petitioner had "never discussed or sold insurance products or securities to [James Gamache or the Paakaulas], and without any complaints from or about Petitioner by [the Arrudas or Pachecos]," [20] Moriyama continued to prosecute Petitioner.

Respondents' probable cause, however, was not based exclusively on complaints from specific consumers but, rather, rested on the underlying investigation conducted by OCP, which had found that Petitioner was part of an overall "scheme" to sell long term annuities, and that as part of this scheme, Petitioner had misrepresented himself to consumers through use of misleading business cards and letterhead. As set forth *supra*, Respondents had charged Petitioner with, *inter alia*, unfair and deceptive trade practices pursuant to HRS § 481A–3, which includes "(3) [c]aus[ing] likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by another[,]" and "(12) [e]ngag[ing] in any conduct which similarly creates a likelihood of confusion or of misunderstanding."

Under the standard for determining whether probable cause existed, the first question is whether the plaintiff subjectively believed in the facts underlying the claim. Restatement (Second) of Torts § 675. Respondents attached another declaration from Moriyama to their Memorandum in Support of their second motion for summary judgment. He stated, in part,

---

19. Respondents included a section in their second motion for summary judgment titled "Probable Cause Existed For the Continuation of the Prior Proceeding. At No Time During the Pendency Of The Prior Proceeding Did [Respondent] Moriyama Act With Malice." In his Memorandum in Opposition to Respondents' second motion for summary judgment, Petitioner argued that "[t]here is substantial evidence showing that there is a genuine issue as to whether there was probable cause for continuing the prosecution of [Petitioner]." In their Reply Memorandum in connection with the second motion for summary judgment, Respondents further asserted that "[t]he fact that some elderly persons did not want to participate in the OCP proceeding does not create a lack of probable cause that a violation of the law had occurred."

20. In support of his Memorandum in Opposition to Respondents' second motion for summary judgment, Petitioner provided the same affidavit, dated September 13, 2005, in which he states that he "did not sell, attempt to sell and never even discussed the sale of securities [or insurance products] with the Arrudas, [James Gamache, the Paakulas, or the Pachecos]." It also states that, "[a]ll work I performed for the Law Offices of Rodwin Wong was at the direction of and under the supervision and responsibility of [Rodwin Wong][,] [Rodwin Wong] described my job as being a paralegal[,]" and "I was never privy to the relationship between the Law Offices of Rodwin Wong, [Rodwin Wong], [or] [Dan Fox]."

[a]fter filing the lawsuit, *information acquired by OCP continued to confirm* what the various investigations had earlier revealed concerning [Petitioner's] and other defendants' conduct and association with one another. As the litigation progressed through discovery and continued investigations, *the information that I and other persons at OCP obtained continued to substantiate the allegations* of OCP's complaint.

(Emphases added.) This declaration indicates that throughout the pendency of the proceedings, Moriyama continued to believe in the facts underlying the suit.

 Then, it must be determined whether Moriyama's belief in the facts underlying his continuation of the suit was reasonable. On this point, Petitioner alleges in his September 19, 2005 affidavit that "[Respondents] knew that there was no probable cause to prosecute Petitioner based on annuities sold to and/or securities sold for the [Arrudas, James Gamache, the Paakaulas, or the Pachecos], on October 10, 2005, and yet ... [ ] Moriyama continued his prosecution of [Petitioner]...." *Id.* However, Moriyama's belief in the facts underlying the initial complaint still was reasonable based on the information he had regarding Petitioner's involvement in the overall scheme, including Petitioner's employment by Rodwin Wong. Moriyama's second declaration also stated that after the lawsuit was filed, additional consumers who dealt with Petitioner "complained to, or were referred to, OCP[,]" including the Cherrys,[21] James Ah Nee, and Blanche Schwarz. Thus, Moriyama's belief in the existence of facts indicating that Petitioner was part of the scheme to sell long term annuities to elderly consumers, was objectively reasonable.[22]

Finally, in order to have probable cause, Moriyama must have continued during the pendency of the suit to "correctly or reasonably" believe that under the facts at the time, the claim against Petitioner might be "valid under the applicable law." Restatement (Second) of Torts § 675. As discussed, Respondents had alleged that Petitioner violated, *inter alia,* HRS § 481A–3, by engaging in deceptive trade practices. HRS § 481A–3 states that "[a] person engages in deceptive trade practices when, in the course of the person's business, vocation, or occupation, the person: .... (3)[c]auses likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another.... or (12)[e]ngages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Moriyama's belief that Petitioner had misrepresented himself to consumers, through his alleged use of false contact information on his business cards and letterhead, could reasonably have led Moriyama to believe that a claim against Petitioner for violations of subsections (3) and (12) of HRS § 481A–3, among other things, might be valid under the applicable law. *See* Restatement (Second) of Torts § 675. Thus, Moriyama's continuing prosecution of Petitioner satisfies the element of probable cause as discussed in *Brodie* and the Restatement (Second) of Torts § 675. Summary judgment in favor of Respondents on this issue then was appropriate.

### B.

 As discussed *supra* with regard to Petitioner's claim that Moriyama mali-

---

**21.** Although, as noted, summary judgment was later granted to Petitioner with respect to claims arising from his interactions with the Cherrys, it was granted on the basis of res judicata.

**22.** Based on the similarity of their elements, as discussed *supra,* the standard for determining whether a plaintiff had probable cause for maintaining a lawsuit should be coterminous with that of initiating a lawsuit. As set forth by the Restatement (Second) of Torts § 675:

> One who takes an active part in the initiation, *continuation* or procurement of civil proceedings against another *has probable cause for*

*doing so* if he reasonably believes in the existence of the facts upon which the claim is based, and either

> (a) correctly or reasonably believes that under those facts the claim may be valid under the applicable law, or
> (b) believes to this effect in reliance upon the advice of counsel, sought in good faith and given after full disclosure of all relevant facts within his knowledge and information.

(Emphases added.) *See also Brodie,* 2 Haw.App. at 319, 631 P.2d at 602 (discussing the standard above as applied to the initiation of a lawsuit).

ciously initiated the prosecution against Petitioner, Petitioner must produce "independent evidence" of malice. *Young*, 119 Hawai'i at 419, 198 P.3d at 682. Petitioner states that it is "well established" that " '[m]alice ... may be inferred ... from want of probable cause.' " (Quoting *Stewart v. Sonneborn*, 98 U.S. 187, 194, 25 L.Ed. 116 (1878).) However, under Hawai'i case law, the evidence suggesting lack of probable cause must itself support an inference of malice, and if it does not support that inference, then Petitioner must have "independent evidence" of that malice. *Brodie*, 2 Haw.App. at 322, 631 P.2d at 605. In *Brodie*, for example, the ICA held that "where the only evidence of a want of probable cause is the inference that may be drawn from the voluntary dismissal of the original action," a finding that there is no probable cause "will not support the second inference, that the defendant acted with improper motives. There must be some other direct or circumstantial evidence to support the inference of malice." *Id.* Here, where Moriyama had probable cause to initiate the prosecution, malice cannot be inferred.

In any event, Petitioner does not allege any "independent evidence" to support an inference that Moriyama acted with malice in maintaining the prosecution. Petitioner's only argument is that Moriyama continued the prosecution despite knowing that there was no probable cause for any of the charges as alleged. On the other hand, Respondents point to Moriyama's declaration as evincing his lack of malice during the pendency of the 2004 proceeding. Specifically, as noted before, they allege that Moriyama granted several extensions to Petitioner personally to allow him more time to respond to the original OCP complaint. Petitioner provided the same evidence and affidavits with regard to malice as was attached to his Memorandum in Opposition to Respondents' first motion for summary judgment, including the Matsuoka affidavit. As discussed, the allegations set forth in Matsuoka's affidavit do not create a genuine issue of material fact as to whether malice can be inferred on the part of Moriyama in filing the complaint. Similarly, the allegations do not create a genuine issue of material fact as to whether Moriyama acted with malice in continuing the prosecution.

Therefore, Petitioner cannot support his allegation that Moriyama acted with malice with any independent evidence in the form of specific facts from which malice can be inferred. *See Cayetano*, 111 Hawai'i at 483, 143 P.3d at 22. Thus summary judgment must be granted in favor of Respondents on the issue of malice. Inasmuch as all three elements must be satisfied to sustain an action for maintaining a malicious prosecution, the third element of successful termination of the prior proceeding in Petitioner's favor need not be reached.

### VII.

■ Petitioner's third question, whether HRS § 487–1 is relevant in determining the standard of care for his negligence action,[23] is preserved on appeal. The ICA interpreted his argument as asserting that HRS § 487–1 created a private right of action and resolved that issue in the negative. Although Respondents contend that Petitioner changed his argument on appeal, and argued for the first time that HRS § 487–1 is relevant to the standard of care in a negligence action,[24] the record supports Petitioner's contention that he argued both issues before the court below. Petitioner contended both that HRS § 487–1 set forth a private right of action[25] and, in the alternative, that HRS § 487–1 was informative as to Respondents' duty of care for

---

23. As noted, in his complaint in the instant case, Petitioner alleged that Moriyama's "failure to sufficiently investigate" the claims against Petitioner was negligent.

24. "As a general rule, if a party does not raise an argument at trial, that argument will be deemed to have been waived on appeal; this rule applies in both criminal and civil cases." *State v. Moses*, 102 Hawai'i 449, 456, 77 P.3d 940, 947 (2003);

*see e.g., State v. Ildefonso*, 72 Haw. 573, 584, 827 P.2d 648, 655 (1992) ("Our review of the record reveals that [the defendant] did not raise this argument at trial, and thus it is deemed to have been waived.").

25. Since Petitioner did not present this issue in his Application, we do not address whether or not HRS § 487–1 sets forth a private cause of action. *See Arquette*, 2012 WL 2864352 at *3.

Petitioner's negligence claim.[26] Petitioner argues (1) that under *Lee v. Corregedore*, 83 Hawai'i 154, 173, 925 P.2d 324, 343 (1996), a court may "adopt the requirements of a statute as the standard of conduct necessary to avoid liability for negligence," and (2) that pursuant to *Tseu ex rel. Hobbs v. Jeyte*, 88 Hawai'i 85, 962 P.2d 344 (1998), "HRS § 487–1 is indicative of a duty of care." However, neither case demonstrates that HRS § 487–1 creates or is "indicative of" a duty of care.

### A.

Pursuant to *Corregedore*, a duty of care may be established by statute if a "legislative enactment [ ] lays down requirements of conduct, and provides expressly or by implication that a violation shall entail civil liability in tort." 83 Hawai'i at 172, 925 P.2d at 342. However, HRS § 487–1 cannot be construed to "lay[ ] down requirements of conduct[.]" *Id.* The statute creates "a permanent office of consumer protection" for the purpose of coordinating "the services offered to the consumer," and "aiding the development" of various programs. HRS § 487–1. The statute does not obligate government officials to act in a certain manner or in accordance with any particular standard or proscribe any conduct. In sum, the statute does not "lay[ ] down requirements of conduct." *Corregedore*, 83 Hawai'i at 172, 925 P.2d at 342.

Further, Petitioner conceded in its Answering Brief before the ICA that the statute "contains no express provision that its violation shall result in tort liability, and no implication to that effect." Because *Corregedore* requires that the statute "provide[ ] expressly or by implication that a violation shall entail civil liability in tort," *id.*, *Corregedore* does not apply to HRS § 487–1.

### B.

Also, *Jeyte* does not indicate that HRS § 487–1 is "indicative of a standard of care." In *Jeyte*, this court held that the plaintiff could pursue "a common law tort action for negligence" when the Hawai'i Civil Rights Commission (HCRC) negligently investigated a complaint against the plaintiff. 88 Hawai'i at 91, 962 P.2d at 350. *Jeyte* reasoned that "the HCRC is subject to a duty to follow its own administrative rules," and noted that the HCRC had failed to follow a rule which required it to recognize an affirmative defense to what would otherwise be a discriminatory practice. *Id. Jeyte* then held that "there exists a duty of reasonable care in the exercise of a statutorily granted authority." *Id.* at 92, 962 P.2d at 351.

On reconsideration, however, this court clarified *Jeyte's* scope. According to this court, the HCRC misapprehended the opinion, because "as stated on multiple occasions in the opinion," the "cause of action which may exist against the HCRC *is based on a duty to follow its own administrative regulations.*" *Id.* at 93, 962 P.2d at 352 (emphasis added). Here, Petitioner makes no argument that Respondents ignored or violated applicable regulations. Moreover, HRS § 487–1 states the purpose behind the creation of an office of consumer protection, but does not provide any standard governing conduct or any provision which prescribes a duty. Consequently, under these facts, *Jeyte* is not "indicative of a standard of care."

### VIII.

With respect to Petitioner's fourth question, Respondents asked that Petitioner pay for the costs of mediation by Dispute Prevention Resolution,[27] for the deposition tran-

---

26. In his Memorandum in Opposition to Respondents' first motion for summary judgment, Petitioner stated that "[HRS § 487–1] imposes a duty of care on [Respondents] to exercise their statutory duties with due regard to [Petitioner's] legitimate business activities. *See Corregedore*, 83 Hawai'i at 172, 925 P.2d at 342 (Duty in a negligence action may be defined by common law or by statute[.] )." Petitioner further asserted that, " '[i]f a statute []contains no express provision that its violation shall result in tort liability, and no implication to that effect, the

court may, and in certain types of cases customarily will, adopt the requirements of the enactment as the standard of conduct necessary to avoid liability for negligence.' " (Quoting Restatement (Second) of Torts § 285 comment c (1965).)

27. According to the declaration of Lawrence I. Kawasaki, mediation was conducted on February 2, 2009, with Keith Hunter of Dispute Prevention and Resolution, Inc.

scripts and records of Dr. Claudine Kimura, Petitioner, Moriyama, and Dr. L. Martin Johnson, and for the transcript of the first summary judgment hearing. On July 13, 2010, Petitioner objected to the taxation of these costs, arguing that mediation was not a cost explicitly set forth by statute and that the depositions were not necessary for Respondents' case. Respondents replied that the costs were "reasonable on their face and were necessarily incurred. . . ." The court allowed Respondents the costs of obtaining the deposition transcript of Moriyama and the transcript of the first summary judgment proceedings, but held that Petitioner was not required to pay for the costs of mediation, or of the other deposition transcripts.

### A.

■ Pursuant to HRS § 607-9,[28] "[n]o other costs of court shall be charged in any court in addition to those prescribed in this chapter." However,

> [a]ll actual disbursements, including but not limited to, intrastate travel expenses for witnesses and counsel, expenses for deposition transcript originals and copies, and other incidental expenses, including copying costs, intrastate long distance telephone charges, and postage, sworn to by an attorney or a party, and deemed reasonable by the court, may be allowed in taxation of costs. In determining whether and what costs should be taxed, the court may consider the equities of the situation.

HRS § 607-9. Both parties agree that under HRS § 607-9, "the court may not deny costs to the prevailing party without justification, unless the circumstances justifying the denial of costs are plain from the record."

*Takeuchi,* 88 Hawai'i at 52, 961 P.2d at 617; *see also* HRCP Rule 54(d) ("[C]osts shall be allowed as a matter of course to the prevailing party unless the court otherwise directs."). Further, both parties agree that the court did not expressly justify its denial of costs in the present case.

### B.

■ Petitioner contends that the reasons supporting the court's denial of costs "are evident from the record as [Respondents'] malicious prosecution of [Petitioner] compelled him to defend himself in a substantive amount of litigation which spanned two years." *Sheets v. Yamaha Motors Corp., U.S.A.,* 891 F.2d 533 (5th Cir.1990), is instructive in this regard.[29] *Sheets* held that the trial court's reason for the denial of costs was "apparent from the record," because the court was "forced to endure defendants' repeated and abusive hardball tactics" such as violating discovery orders, misleading the plaintiff, and utilizing "obfuscatory defense strategies." *Id.* at 539. Under these "egregious circumstances," *Sheets* held that the failure to set forth reasons was not an abuse of discretion. *Id.* at 540. Here, the record does not evince circumstances that would make the reasons for the court's denial of costs "plain from the record," such as in the manner exemplified in *Sheets.*

### C.

Respondents argue that the costs of mediation and the depositions should have been awarded to Respondents as a matter of law. They cite *Pulawa,* 112 Hawai'i at 19–22, 143 P.3d at 1221–24, for the proposition that "in the absence of evidence of misconduct or

---

28. HRS § 607-9 provides:

> No other costs of court shall be charged in any court in addition to those prescribed in this chapter in any suit, action, or other proceeding, except as otherwise provided by law. All actual disbursements, including but not limited to, intrastate travel expenses for witnesses and counsel, expenses for deposition transcript originals and copies, and other incidental expenses, including copying costs, intrastate long distance telephone charges, and postage, sworn to by an attorney or a party, and deemed reasonable by the court, may be allowed in taxation of costs. In

> determining whether and what costs should be taxed, the court may consider the equities of the situation.

29. "This court has previously noted that Federal Rules of Civil Procedure Rule 54(d) is functionally identical to HRCP Rule 54(d). Where a Hawai'i rule of civil procedure is identical to the federal rule, the interpretation of this rule by federal courts is highly persuasive." *Pulawa,* 112 Hawai'i at 19 n. 15, 143 P.3d at 1221 n. 15 (citing federal authority to determine whether various costs should be assessed to the losing parties).

some fault on the part of the prevailing party ... the trial court does not have any discretion to reduce or deny an award of costs."

In *Pulawa*, the losing parties argued that, because they demonstrated that they were indigent, the circuit court abused its discretion in requiring them to pay costs. *Id.* at 19, 143 P.3d at 1221. A majority of this court said there is "a strong presumption that the prevailing party will recover costs," which can only be overcome by "some showing [by the losing party] that an award would be inequitable under the circumstances." *Id. Pulawa* held that the losing parties had not provided enough evidence to demonstrate that the denial of costs was an abuse of discretion.[30] *Id.* at 20–22, 143 P.3d at 1222–24. *Pulawa* thus does not stand for the broad proposition that evidence is *always* necessary to justify a denial of costs.[31]

■ Instead, this court has held that "the losing party bears the burden of showing that the denial of costs is justified." *Takeuchi*, 88 Hawai'i at 53, 961 P.2d at 618. Justification, however, does not necessarily require an evidentiary showing. A party may set forth reasons that a certain expense item should be denied without making an evidentiary showing on that issue. *See* 10 Moore's Federal Practice § 54.101(b) (3d ed.1998) (listing reasons for declining to tax costs that do not require an evidentiary showing, such as costs incurred unreasonably).

## D.

The costs associated with mediation are not explicitly listed in HRS § 607–9 as tax-

able. It has been held that a court has discretion to assess the costs of mediation to the losing party if the mediation was court-ordered. *See, e.g., Gibson v. Bobroff,* 49 Cal.App.4th 1202, 57 Cal.Rptr.2d 235, 240 (1996) ("Accordingly, we reject defendants' view that only those costs directly related to the preparation or the trial of a case are recoverable as being reasonably necessary to the conduct of the litigation. This is especially true here since the mediation was court-ordered."); *Spears v. Huber,* No. 07–11–0193–CV, 2012 WL 933780, at *4 (Tex. App. March 20, 2012) ("As for the mediator's fee, when a mediator is appointed by the court, it may set a reasonable fee for the services of the mediator and tax the fee as costs of suit."); *Albuquerque Commons P'ship v. City Council of Albuquerque,* 146 N.M. 568, 212 P.3d 1122, 1141 (N.M.App. 2009), *reversed on other grounds,* 149 N.M. 308, 248 P.3d 856 (2011)(holding that it was within the trial court's discretion to tax the costs of mediation because the mediation was court ordered and the losing party did not participate in good faith); *Elder v. Islam,* 869 So.2d 600, 603 (Fla.App.2004)("[T]he costs of mediation can be awarded if the parties are required to mediate under a statute or court rule.").

■ Costs generated in the pursuit of litigation are distinguished from those "severable from and unrelated to the litigation." *See Takeuchi,* 88 Hawai'i at 54–55, 961 P.2d at 619–20 (holding that "[m]eals are not taxable costs" because "the necessity of eating lunch is severable from and unrelated to the litigation"). When a court orders the parties

---

**30.** The dissent in *Pulawa* argued that the losing parties' failure to list their assets was not dispositive, and that in any event the case should be remanded to allow the losing parties to present the necessary evidence. 112 Hawai'i at 28, 143 P.3d at 1230 (Acoba, J., concurring and dissenting).

**31.** Numerous Hawai'i cases acknowledge that a losing party may justify a denial of costs without submitting evidence. *See, e.g., Takeuchi,* 88 Hawai'i at 54, 961 P.2d at 619 (noting that office supplies are not generally taxable costs, and therefore the prevailing party was required to demonstrate a "compelling rationale" in order for the court to grant this expense)(citing *Tradewinds Hotel Inc. v. Cochran,* 8 Haw.App. 256,

271, 799 P.2d 60, 68, *reconsideration denied,* 8 Haw.App. 662, 868 P.2d 466 (1990); *Harkins v. Ikeda,* 57 Haw. 378, 386, 557 P.2d 788, 794 (1976)) (denying costs without an evidentiary showing because out of state traveling expenses were not explicitly mentioned by statute); *Geldert v. State,* 3 Haw.App. 259, 268, 649 P.2d 1165, 1172 (1982) (holding that deposition costs are not awarded unless the deposition was reasonably necessary for trial); *but see Abreu v. Raymond,* 56 Haw. 613, 614, 546 P.2d 1013, 1014 (1976) ("[T]he denial of costs to the prevailing party or the assessment of partial costs against him is in the nature of a penalty for some defection on his part in the course of the litigation.").

to enter mediation, they have no choice but to obey. In such circumstances, the costs of entering court-ordered mediation are related to and cannot be "sever[ed] from" the underlying litigation. *Takeuchi*, 88 Hawai'i at 55, 961 P.2d at 620; *see Gibson*, 49 Cal.App.4th at 1209, 57 Cal.Rptr.2d 235 (noting that court-ordered mediation "is a necessary part of litigation"); *see also Elder*, 869 So.2d at 603 (awarding the costs of court-ordered mediation because the parties "had to expend that"). Hence, it would be within the court's discretion to decide that the cost of court-ordered mediation is a "reasonable" cost that may be taxed. HRS § 607–9.

■ On the other hand, when the parties voluntarily enter into mediation, it has been concluded that the losing party cannot be assessed the costs of mediation absent a compelling demonstration by the prevailing party. *Smith v. Village of Ruidoso*, 128 N.M. 470, 994 P.2d 50, 60 (N.M.App.1999)("We do not think that, with respect to mediations conducted pursuant to an agreement of the parties, the expense of the mediator's fee should be a recoverable cost."); *see also Orlando Reg'l Med. Ctr., Inc., v. Chmielewski*, 573 So.2d 876, 883 (Fla.App.1990), *abrogated on other grounds by Boulis v. Florida Dep't of Transp.*, 733 So.2d 959 (Fla.1999)("Although reasonable costs and expenses for a statutorily required mediation procedure are available, appellants failed to establish that they were required to submit to mediation in this case under any statute or court rule."); *cf. Gibson*, 49 Cal.App.4th at 1209 n. 7, 57 Cal.Rptr.2d 235 ("We expressly do not decide whether a party prevailing after a trial which is preceded by unsuccessful *voluntary* mediation would be entitled to such costs.") (emphasis in original); *but see Liker v. Found. for Preservation of Mt. Helix Nature Theater*, No. D041091, 2004 WL 1405937, at *6, *8 (Cal.App. June 24, 2004) ("The trial court had discretion to award the Likers their costs of voluntary mediation.").[32]

Mediation "facilitate[s] the effective, timely and voluntary resolution of disputes." *Cf.* HRS § 613–2 (Supp.2000) (establishing a center for alternative dispute resolution). In other words, the goal of mediation is to avoid trial, and its attendant costs, altogether. A cost incurred by the parties' joint decision to attempt to *avoid* trial would appear to be a cost separate from the underlying litigation, as it represents a shared attempt to avoid the costs of trial. Moreover, because litigants may voluntarily enter into mediation for their mutual benefit, assessing the losing party the entire cost of mediation would appear inequitable. Consequently, unlike court-ordered mediation, a voluntary decision to enter mediation is "severable from and unrelated to the litigation," *see Takeuchi*, 88 Hawai'i at 54–55, 961 P.2d at 619–20, inasmuch as under such circumstances voluntary mediation is not a necessity of litigation.

Based on the foregoing, generally, the costs of voluntary mediation should not be taxable. In that light, the prevailing party must provide a compelling reason for the court to assess the cost of voluntary mediation to the losing party. *Cf. id.* at 54, 961 P.2d at 619 ("As a general rule, routine expenses related to operating a law firm are not taxable. Therefore, [the prevailing party] would have to demonstrate a compelling rationale for the court to grant this expense.").

As discussed *supra*, it was error for the court to decline to assess the costs of mediation without providing reasons. *Id.* at 52, 961 P.2d at 617 ("[T]he court may not deny costs to the prevailing party without justification, unless the circumstances justifying the denial of costs are plain from the record."). Hence, the court's decision not to assess Petitioner the costs of mediation must be remanded so that the court may set forth the reasons for its decision.

---

32. *Liker* reasoned that awarding the costs of voluntary mediation may encourage parties to enter mediation, because they may believe that the other side will be compelled to bear their costs. 2004 WL 1405937, at *8. *Liker*'s assumption is unrealistic—it is more likely that parties will voluntarily enter mediation when, based on the circumstances of a specific case, they believe that there is a reasonable chance of successfully avoiding the expenses associated with trial. In any event, the relevant inquiry under Hawai'i law is whether an expense is "severable from and unrelated to the underlying litigation." *Takeuchi*, 88 Hawai'i at 54–55, 961 P.2d at 619–20.

### E.

██ It is well-settled that "deposition costs are only recoverable if the depositions were necessarily obtained for use in the trial." *Tradewinds Hotel*, 8 Haw.App. at 271, 799 P.2d at 69; *see also Nani Koolau Co. v. K & M Constr., Inc.*, 5 Haw.App. 137, 143, 681 P.2d 580, 586 (1984) (same); *Geldert*, 3 Haw.App. at 268, 649 P.2d at 1172 (same); 10 Moore's Federal Practice § 54.101(b) (court may decline to tax costs if costs incurred unreasonably). The court in this case may decline to assess the costs of the depositions against Petitioner if it found that the depositions were not necessarily obtained for use at trial, or that to do so would be inequitable.

Although refusing to tax such costs was within the court's discretion, again, as discussed *supra*, it was error for the court to do so without providing reasons. *Takeuchi*, 88 Hawaiʻi at 52, 961 P.2d at 617. Consequently, this issue also must be remanded to allow the court to set forth the reasons for not assessing Petitioner the deposition costs of Dr. Claudine Kimura, Petitioner, and Dr. L. Martin Johnson.

### IX.

██ Finally, with respect to Petitioner's fifth question, the ICA properly denied Petitioner's Motion for Recusal. Disqualification or recusal cases involve a two-part analysis. *State v. Ross*, 89 Hawaiʻi 371, 377, 974 P.2d 11, 17 (1998) (citing *State v. Brown*, 70 Haw. 459, 467, 776 P.2d 1182, 1187 (1989)). First, "HRS § 601–7[ [33] ] [ (Supp.2004) ] is applied to determine whether the alleged bias is covered by any of the specific instances prohibited therein." *Id.* Then, "[i]f the alleged bias falls outside of the provisions of HRS § 601–7, the court may [ ] turn, if appropriate, to the notions of due process described in *Brown* in conducting the broader inquiry of whether 'circumstances ... fairly give rise to an appearance of impropriety and ... reasonably cast suspicion on the judge's impartiality.' " *Id.* (quoting *Brown*, 70 Haw. at 467 n. 3, 776 P.2d at 1188 n. 3)(ellipses in original) (brackets omitted). The decision by the ICA to deny Petitioner's Motion for Recusal thus is reviewed for abuse of discretion. As this court noted in *Ross*, "[d]ecisions on recusal or disqualification present perhaps the ultimate test of judicial discretion and should thus lie undisturbed absent a showing of abuse of discretion." *Id.* at 375, 974 P.2d at 15.

### A.

██ HRS § 601–7(b) sets forth the procedure for seeking disqualification based on personal bias. The statute requires the movant to timely file an affidavit "stat[ing] the facts and reasons for the belief that bias or prejudice exists." *Id.* Furthermore, in considering whether the facts allege disqualification pursuant to HRS § 601–7,

> "a judge whose disqualification is sought must take the facts alleged as true, but can pass upon whether they are legally sufficient." *State v. Mata*, 71 Haw. 319, 325, 789 P.2d 1122, 1126 (1990). When the affidavit to disqualify refers to matters of record, however, we may consider the entire record in making our determination. *Schutter v. Soong*, 76 Hawaiʻi 187, 205, 873 P.2d 66, 84 (1994) (citing *Peters v. Jamieson*, 48 Haw. 247, 257, 397 P.2d 575, 582 (1964)). "The reasons and facts for the belief the [affiant] entertains ... must give

---

**33.** To reiterate, HRS § 601–7 provides, in relevant part:

§ 601–7. **Disqualification of judge; relationship, pecuniary interest, previous judgment, bias or prejudice.**

(b) Whenever a party to any suit, action, or proceeding, civil or criminal, makes and files an affidavit that *the judge before whom the action or proceeding is to be tried or heard has a personal bias or prejudice either against the party or in favor of any opposite party to the suit*, the judge shall be disqualified from proceeding therein. *Every such affidavit shall state the facts and the reasons for the belief that bias or prejudice exists* and shall be filed before the trial or hearing of the action or proceeding, or good cause shall be shown for the failure to file it within such time. No party shall be entitled in any case to file more than one affidavit; and no affidavit shall be filed unless accompanied by a certificate of counsel of record that the affidavit is made in good faith. Any judge may disqualify oneself by filing with the clerk of the court of which the judge is a judge a certificate that the judge deems oneself unable for any reason to preside with absolute impartiality in the pending suit or action. (Emphases added.)

fair support to the charge of a bent of mind that may prevent or impede impartiality of judgment." *Whittemore v. Farrington,* 41 Haw. 52, 57 ( [Terr.] 1955) (citation omitted). The test assumes the viewpoint of a reasonable onlooker, rather than the subjective belief of the judge. See *Yorita v. Okumoto,* 3 Haw.App. 148, 153, 643 P.2d 820, 825 (1982).

*Ross,* 89 Hawai'i at 377, 974 P.2d at 18.

 Bias cannot be premised on adverse rulings alone. *Id.* at 378, 974 P.2d at 18 (citing *Peters,* 48 Haw. at 257, 397 P.2d at 583). In *Schutter,* this court ruled that "[w]here the record reflects 'marked personal feelings . . . on both sides' inflicting lingering 'personal stings' on the judge (i.e., where the case conveys an apparent 'flavor of animosity on the part of the judge against counsel,' . . . such that the citing judge manifestly loses his or her capacity to 'perform judicial duties without bias or prejudice,')[,] the judge should not preside." 76 Hawai'i at 205, 873 P.2d at 84 (ellipses in original) (quoting *Evans v. Takao,* 74 Haw. 267, 291–92, 842 P.2d 255, 266 (1992)).

 In the instant case, the record reflects no animosity by Judge Leonard against Petitioner, and instead, the motion to disqualify is based solely on a declaration by Petitioner's attorney.[34] As discussed, the test is whether a reasonable onlooker would find that the facts, here, as alleged in the declaration, are legally sufficient to disqualify the judge. *Yorita,* 3 Haw.App. at 153, 643 P.2d at 825.

In *Jou v. Schmidt,* 117 Hawai'i 477, 184 P.3d 792 (App.2008), the ICA considered whether Hawai'i Supreme Court Associate Justice Sabrina S. McKenna, then a judge on the Circuit Court of the First Circuit, was required to recuse herself from a proceeding in which one of the parties had a seat on the judicial selection committee. The ICA, af-

firming the denial of the motion for recusal, held that movant's declaration "failed to include any specific facts regarding Judge McKenna's retention or petition for retention. Therefore, the sweeping inference that Judge McKenna is, *ipso facto,* biased or prejudiced . . . is speculative at best." *Id.* at 484, 184 P.3d at 799. In this case, Petitioner also does not set forth specific facts in the declaration, beyond speculation that there is the "potential for partiality," as to how Judge Leonard would be biased or prejudiced against Petitioner. Thus, even taking the facts alleged as true, there is no legal showing that Judge Leonard would have a personal bias in this case, under HRS § 601–7.

### B.

In reviewing disqualification actions, a court next considers "whether 'circumstances . . . fairly give rise to an appearance of impropriety and . . . reasonably cast suspicion on [the judge's] impartiality.' " *Chen v. Hoeflinger,* 127 Hawai'i 346, 362, 279 P.3d 11, 27 (App.2012)(quoting *Ross,* 89 Hawai'i at 377, 974 P.2d at 17) (brackets and ellipses in original) (other citation omitted). When the ICA considered this issue in *Jou,* it held that, although the record was silent on whether any commissioner removed herself or himself from Judge McKenna's retention petition, the movant "failed to overcome the presumption that [the commission] acted in accordance with its rules and otherwise failed to establish disqualifying facts in this case." *Jou,* 117 Hawai'i at 484, 184 P.3d at 799. Similarly, under the circumstances of this case, Petitioner did not establish any disqualifying facts that would reasonably cast suspicion on Judge Leonard's impartiality.

In *Chen,* the ICA reviewed a family court decision in which one of the attorneys had been appointed a per diem family court judge after the trial concluded, but before the court issued a decision. 127 Hawai'i at 362, 279

---

**34.** In support of his Motion for Recusal filed pursuant to Hawai'i Rules of Appellate Procedure Rule 27, Petitioner included the following declaration from his attorney:

> 2. I publicly opposed the nomination of Associate Judge Katherine Leonard of the [ICA] to serve as Chief Justice of the Hawai'i Supreme Court.

> 3. Judge Leonard has recently been assigned to the above-captioned case as a substitute judge.

> 4. I am concerned about the appearance and potential for partiality raised by having Judge Leonard participate in a case in which I am lead counsel so soon after the controversy involving her nomination.

P.3d at 27. The ICA held that the presiding judge did not abuse his discretion in denying the motion for his disqualification. *Id.* The ICA noted that the speculative "personal relationship" between the presiding family court judge and an attorney who had been recently appointed as a family court judge "did not give rise to the probability of unfairness or the temptation for the judge to forget the applicable burden of proof." *Id.* (citing *Ross,* 89 Hawai'i at 379, 974 P.2d at 19). Similarly, in the instant case, the involvement of Petitioner's attorney in Judge Leonard's nomination process, giving rise to the "appearance and potential for partiality" on the part of Judge Leonard was speculative. No specific facts were alleged that would "give rise to the probability of unfairness or the temptation for the judge to forget the applicable burden of proof." *Id.* Thus, the ICA did not abuse its discretion in holding that the facts as alleged were not sufficient to warrant Judge Leonard's recusal.

## X.

We affirm the ICA's August 10, 2012 judgment and the ICA's December 6, 2011 order denying Petitioner's Motion for Recusal, but for the reasons stated herein. Further, for the reasons stated herein, we affirm the court's April 19, 2011 Amended Final Judgment with respect to its March 29, 2010 and June 30, 2010 orders granting summary judgment, and vacate the court's April 19, 2011 Amended Final Judgment with respect to its August 23, 2010 Order Granting Plaintiff's Motion for Review of Costs and remand the Order.